UNITED STATES of America,
Plaintiff,

v.

Julius Schutze GISSEL, d/b/a Collin &
Gissel and Globe Indemnity Company,
Defendants.

UNITED STATES of America,
Plaintiff,

v.

C. J. THIBODEAUX AND COMPANY,
and Travelers Indemnity Company,
Defendants.

Civ. A. Nos. 70-H-542, 70-H-543.

United States District Court,
S. D. Texas, Houston Division.

Jan. 19, 1973.

Anthony J. P. Farris, U. S. Atty., B. Stephen Rice, Asst. U. S. Atty., Houston, Tex., Anthony W. Gross, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff.

Alan S. Dale, Eastham, Watson, Dale & Forney, Houston, Tex., for defendants Gissel and Globe Indemnity Company.

Robert M. Julian, Vinson, Elkins, Searls & Smith, Houston, Tex., for defendants C. J. Thibodeaux & Co. and Travelers Indemnity Co.

## MEMORANDUM OPINION

CARL O. BUE, Jr., District Judge.

In these consolidated actions the United States, as obligee, seeks to recover on two $10,000 bonds which it is asserted guaranteed the payment of certain customs duties previously assessed against the vessel SS SEA PIONEER pursuant to 19 U.S.C. § 257 as a result of foreign vessel repairs. The defendants are (1) the principals on the bonds, who are also the local berth or husbanding agents for the same vessel and its owner on separate occasions, and (2) the sureties on said bonds. The parties have stipulated the facts and, therefore, the causes have been submitted for decision on briefs.

### I.

### THE FACTUAL BACKGROUND

The facts which lead to the instigation of these lawsuits against the local berth agents and the sureties on their bonds can be briefly summarized. The SS SEA PIONEER was a 18,000 ton merchant vessel owned and operated by Pioneer Tankers, Inc. and documented under the laws of the United States. The vessel made various trips to foreign ports and thereafter correlative first entries into American ports as a merchant vessel. Two such first entries into American ports provide the setting for these lawsuits. The first occurred at Port Arthur, Texas, and the second took place approximately 18 months later at Galveston, Texas.

Prior to the Port Arthur entry defendant Collin & Gissel in its capacity as local berth agent for various vessels routinely filed on January 8, 1964, with the Collector of Customs its blanket bond entitled "Vessel, Vehicle, or Aircraft Bond (Term)" on Customs Form 7569

in the principal sum of $10,000 covering the period January 7, 1964, through January 6, 1965. This bond bound this defendant as principal to pay to the Collector of Customs various sums potentially due the United States from the master or owner of the vessels that this defendant represented as a result of their entry into an American port. Defendant Globe Indemnity Company was surety on the bond. On May 22, 1964, defendant Collin & Gissel undertook to act as local agent in connection with the arrival, entry and clearance of the SS SEA PIONEER at the Port of Port Arthur. This defendant through a sub-agent filed with the Collector of Customs at Port Arthur a form entitled "Application and Permit to Lade or Unlade Vessels of 5 Net Tons or More and to Allow Unentered Cargo to Remain upon Wharf Beyond 5-Day Period" on Customs Form 3171 on which certain routine port operations or services were designated in connection with the soon-to-arrive vessel. Reference was made therein to the previously filed blanket bond.

The SS SEA PIONEER duly arrived at Port Arthur on May 27, 1964, inbound from a foreign voyage during which various repairs to the vessel had been made that required the payment of statutory duties. At the time of entry the master of the vessel filed an incomplete Customs Form 7535 designated "Entry of Equipment and/or Repair Parts Made in Foreign Countries upon American Vessels" reflecting that an indeterminate amount of repair duties was due. The vessel subsequently departed for another American port without its master or owner making a deposit or posting a bond for the preliminarily estimated duties. Following various communications between Customs officials and the vessel's owner this foreign repair entry was finally liquidated on November 28, 1967, and notice of duties due in the amount of $14,216.96 was sent to the vessel's owner and defendant Collin & Gissel. However, neither payment nor a statutory protest of the assessment, pursuant to 19 U.S.C. §§ 1514, 1515, was duly forthcoming on behalf of the owner or the local berth agent.

Prior to the Galveston entry of the SS SEA PIONEER, defendant C. J. Thibodeaux and Company (Thibodeaux) in its capacity as local berth agent for various vessels routinely filed its blanket bond entitled "Vessel, Vehicle, or Aircraft Bond (Term)" on Customs Form 7569 in the principal sum of $10,000 covering the period March 1, 1965, through February 28, 1966. Defendant Travelers Indemnity Company was surety on the bond. On October 11, 1965, defendant Thibodeaux undertook to act as local agent in connection with the arrival, entry and clearance of the SS SEA PIONEER at the Port of Galveston. As defendant Collin & Gissel had done, defendant Thibodeaux filed Customs Form 3171 on which certain routine port operations and services were designated in connection with the soon-to-arrive vessel, and reference was made therein to the previously filed blanket bond. The SS SEA PIONEER duly arrived at the Port of Galveston on October 12, 1965, inbound from a foreign voyage during which repairs to the vessel had been made which required the payment of a duty. At the time of entry the master of the vessel filed an incomplete Customs Form 7535 designated "Entry of Equipment and/or Repair Parts Made in Foreign Countries upon American Vessels" reflecting that certain duties on the ship repairs were due. The vessel subsequently departed for another American port without making a deposit or posting a bond for the estimated duties. Following various communications between Customs officials and the vessel's owners this foreign repair entry was finally liquidated on March 26, 1968, and notice of duties due in the amount of $57,674.26 was sent to the vessel's owner and defendant Thibodeaux. However, neither payment nor a statutory protest to this assessment, pursuant to 19 U.S.C. §§ 1514, 1515, was duly forthcoming on behalf of the owner or the local berth agent.

It is at this point that the facts of these lawsuits depart from what would be an ordinary and routine vessel entry and subsequent collection of custom duties from the vessel's owners. Sometime prior to May, 1968, the SS SEA PIONEER was seized in Singapore, Malaya in connection with judicial proceedings instituted to foreclose a ship mortgage held on the vessel. The SS SEA PIONEER was subsequently sold, and the proceeds of the sale were paid into the registry of the Singapore court. At the request and expense of defendant Collin & Gissel the United States agreed that such defendant could intervene on its behalf in the Singapore proceedings to assert the claim for foreign repair duties against the proceeds of the sale on deposit in the court registry. These efforts proved to be of no avail, since on April 29, 1969, the claim was disallowed in its entirety by the Singapore court as being in the nature of an unenforceable foreign revenue and/or penal law. Turning to the only other apparent sources of possible payment of these overdue duties, the United States then made formal demand on the sureties of the bonds of the agent-defendants, Collin & Gissel and Thibodeaux. When payment was not forthcoming in due course, these lawsuits were instituted.

## II.

### THE CONTENTIONS

The contentions of the various parties can be simply stated. The Government contends that the obligations assumed by the defendants in executing the blanket term bonds are express and unequivocal. It is asserted that by the terms of these bonds the defendants as local agents unconditionally promised to pay any duties or other sums found to be legally owed to the United States by the vessel owner or its master. It is the Government's position that, since these defendants chose to obligate themselves unconditionally for the payment of the foreign vessel repair entry duties up to the $10,000 limit of their term bonds, there can be no legal defense to actions such as these to collect under the bonds.

The defendants, however, in an attempt to evade this theory of liability, simply assert that, notwithstanding the express language of the term bonds, they never promised or undertook to pay the foreign repair duties. It is their contention that the term bonds were executed only to accommodate and guarantee the payment of various nominal expenses ordinarily incurred by vessels entering and departing port and for which local berth agents are generally looked to for payment. Alternatively, in the event that they are liable on the bonds, defendants assert that the Government has waived its right to collect the duties from them both as agents and sureties since it granted continuous extensions of time to the owner of the SS SEA PIONEER to liquidate the duties due without their knowledge or consent. It is also asserted that the Government must exhaust its remedies against the vessel and its owner prior to seeking collection from the defendants.

Restated in more practical terms, this is an issue which arises solely because the owner of the SS SEA PIONEER went bankrupt, thereby causing the Government to look around for alternative sources in order to secure payment of such duties on foreign vessel repairs. This situation has caused the Government to focus on the agents' blanket bonds which concededly have never been attacked in such fashion before, at least in the Southern District of Texas.

From the evidence submitted for consideration by this Court, it is apparent that a ruling in this case is of more than incidental significance to all parties. If the Government under these circumstances cannot go against the agent's bond, it presumably has no recourse at all to recover the duties incurred by the bankrupt shipowner as a consequence of its obtaining foreign vessel repairs on the SS SEA PIONEER. On the other hand, there is only a paucity of case authority in this legal area

and no proof in this record of any procedure, custom or practice which firmly supports the theory that a local agent should be liable for such repairs under its blanket bond that routinely covers its services relative to the arrival, entry and clearance of all vessels handled during the one year term of the bond. This legal dispute necessarily compels close scrutiny of the relevant statutes and regulations.

## III.

## SECTION 466 OF THE TARIFF ACT OF 1930: DUTY ON EQUIPMENT OR REPAIR PARTS FOR VESSELS

### A.

### THE STATUTORY BACKGROUND

The Tariff Act of 1930 included within its formal title the following purpose: "An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes." 46 Stat. 590 (1930). This statute provides for the imposition and collection of customs duties upon entry of various foreign merchandise into the United States. Since foreign repair parts on vessels were generally thought of and classified as dutiable merchandise and since it was Congessional policy to encourage the obtaining of American flag vessel repairs in American shipyards, such repairs were expressly included as dutiable merchandise within a provision of the Tariff Act. The tariff law has contained such a provision in substantially the same form since the enactment of section 23 of the Tariff Act of 1866, 14 Stat. 183 (1866).

### B.

### THE STATUTES

■ The statute requiring that a duty be paid on foreign vessel repairs in effect at the times material to these lawsuits provided that:

The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

19 U.S.C. § 257.[1] This section clearly expresses a legislative intention that liability for repair duties accrue, be ascertained and paid upon arrival of the documented American flag vessel at the first American port of entry. This intention that prompt payment be made, while ostensibly achievable in practice at the time of the statute's enactment, would appear to be somewhat less practical now, since it generally takes some time for the repairs and exemptions or remissions to be ascertained by the shipowner and thereafter the duties due computed by the Customs authorities.

In order to accomplish the purpose of this section and the Tariff statute, the Secretary of the Treasury was given statutory authority to promulgate vari-

---

I. As a result of the Tariff Act of 1971 this provision was recodified and is presently found in 19 U.S.C. § 1466.

ous regulations. First, he was authorized to "prescribe forms of entries, oaths, bonds, and other papers". 19 U.S.C. § 66. Second, he was authorized "to make such rules and regulations as may be necessary to carry out the provisions of this chapter". 19 U.S.C. § 1624. Third, he was authorized to "authorize the execution of a term bond the conditions of which shall extend to and cover similar cases of importations over such period of time, not to exceed one year" as he shall fix. 19 U.S.C. § 1623(b)(3). Fourth, in situations in which bonds were not specifically required by statute, the secretary was authorized to promulgate regulations to authorize collectors of customs to require bonds as deemed necessary for the protection of revenue or to assure compliance with any provision of the statute. 19 U.S.C. § 1623(a).

2. This section provides, in part, that:
   § 4.14 Equipment and repairs to American vessels.
   (a) The master's declaration on Customs Form 3415 required by § 4.7(d)(1), covering equipment, repair parts, or material acquired, or expense for repairs incurred, in a foreign country, within the purview of section 466, Tariff Act of 1930, as amended, shall be filed, whether or not the items, or any of them, may be exempt from entry as stated in paragraph (b)(1) of this section.
   (b) Entry on customs Form 7535 shall be made for such equipment or repairs. Such entry shall show the last sailing date from each country at which repairs were made on the particular voyage. Estimated duties shall be deposited or a bond on customs Form 7567 or 7569 given therefor before the vessel shall be allowed clearance, except that—
   (1) No entry or bond shall be required with respect to items which the collector is satisfied are clearly within the purview of R.S. 3115(3), as amended, and
   (2) Vessels owned by the United States, although subject to the provisions of section 466, Tariff Act of 1930, as amended, shall be allowed to proceed without such deposit of duties or filing of a bond, if operated by the Maritime Administration or other agency of the United States or if operated under an agreement providing that such an agency shall pay duties accruing under section 466. Vessels owned by the United States and operated

## C.

## THE REGULATIONS

The basic regulation, promulgated pursuant to the enabling provisions of the statute, to accomplish the purpose of 19 U.S.C. § 257 provides that the vessel's master upon entry at the first American port shall (1) file a declaration on customs form 3415 as to any foreign repairs; (2) file an entry on customs form 7535 for such repairs; (3) file receipts reflecting the repairs, or a physical examination shall be conducted to view the repairs and verify their costs; then (4) the duties shall be estimated and a deposit made or a bond on Customs Forms 7567 or 7569 given before the vessel shall be allowed clearance; and (5) the entry shall be officially liquidated after the above stated receipts, or results of examination, are filed. 19 C.F.R. § 4.14.[2]

by private parties who are liable by agreement for duties accruing under section 466 shall be treated in all respects the same as privately-owned vessels.

(c) The master shall file with the entry receipts showing the costs of items enumerated in the said section 466. If, however, it is impracticable to produce such receipts at the time of entry, liquidation of the entry shall be suspended pending the furnishing of a complete account of the items liable to duty. In such cases the collector shall cause an examination of such equipment or repairs to be made by a representative of the appraiser's office, if possible, in order to verify the cost declared on entry. If the cost of the equipment or repairs, as shown by the complete account when filed, differs from that declared on entry, the collector may permit the entry to be amended accordingly.

(d) When the entry has been completed by the filing of proper evidence of cost and no application for relief as provided for in paragraph (e) of this section, has been filed within the time authorized or, if filed, has been finally acted upon, or the collector is informed that no such application will be filed, the entry shall be liquidated.

(e) An application for relief may be filed with the District Director of Customs alleging that:
(1) An item covered by the entry is not within the class of items liable to duty

In accord with these regulations upon the first entry at an American port, the master or owner of the documented vessel makes a preliminary entry indicating the repairs made in foreign countries by filing Customs Form 3415 and later declares and makes a formal entry of such repairs by filing Customs Form 7535. The declaration on the latter form provides as follows:

I hereby stipulate that the estimated duties will be deposited, or bond given therefor, before clearance is granted, except on vessels specially exempted by regulations of the Secretary of Treasury, and that all increased duties that may accrue will be paid when ascertained.

The form of bonds acceptable to the Customs officials for this purpose are prescribed by 19 C.F.R. § 25.4. That regulation provides for 35 different bonds including the following:

(18) Single entry vessel, vehicle, or aircraft bond, customs Form 7567, in

such amount as the collector may deem necessary, but in no case less than $1,000.

(19) Vessel, vehicle, or aircraft term bond, customs Form 7569, in the amount of $10,000, or such larger amount as may be fixed by the district director of customs at the port where the bond is filed. The bond, when used as a blanket bond, shall be accompanied by a copy for each port named therein.

19 C.F.R. § 25.4. The term bonds referred to under paragraph (19) above of these regulations are on Customs Form 7569 and are identical to those involved in these lawsuits. This form is entitled "Vessel, Vehicle, or Aircraft Bond (Term)", and a descriptive note to the title provides:

To lade or unlade at night or on Sunday or a holiday, to land equipment for repairs, etc., to discharge on lighters or outside docks, to pay legal charges, penalties, etc., to land cargo

under section 466(a) of the Tariff Act of 1930, as amended, or
(2) Such item is within the provisions of section 466(b) or 466(c) of the Tariff Act of 1930, as amended, or
(3) Both of the foregoing.
To insure consideration in liquidation of the entry, the application shall be filed within 90 days from the date of entry. Unless the district director is definitely advised that no application will be filed, the liquidation shall be suspended for 90 days to afford an opportunity for such filing. In meritorious cases and upon written request, the district director may authorize a further suspension of 90 days. Applications for relief submitted after those time periods shall not be considered without prior Bureau approval. Inasmuch as an unprotested liquidation insofar as it relates to the classification of items under section 466(a) of the Tariff Act of 1930, as amended, is final at the expiration of 90 days, a subsequent application in regard to such classification cannot be considered in the absence of a timely protest.

. . . . .

(j) The authority under section 3115 of the Revised Statutes, as amended, to remit or refund duties is delegated to the several collectors of customs and their successors in office. When the evidence referred to in paragraphs (f), (g), or (h) of this

section has been received and examined by the collector of customs he shall notify the owner or operator of the vessel, or other party in interest, of his decision, but if any doubt exists the case shall first be referred to the Bureau for advice. Thirty days after the date of such notice the collector shall proceed to liquidate the entry unless within that period the owner or operator of the vessel, or other party in interest, shall file a petition as provided for in paragraph (k) of this section.

(k) The owner or operator of the vessel involved, or other party in interest, may file with the collector of customs a petition addressed to the Commissioner of Customs for a review of the collector's decision on an application claiming relief under section 3115, Revised Statutes, as amended, (paragraph (e)(2) or (3) of this section). Such petition shall be filed in duplicate within 30 days from the date of the notice of the collector's decision, shall completely identify the case, and shall set forth in detail the exceptions to the collector's decision. When such a petition has been filed, the collector shall immediately transmit both copies thereof and the entire file to the Bureau, together with any comments he may desire to submit. When the Bureau's decision has been received the entry shall be liquidated in accordance therewith.

in other districts or foreign ports, to secure the payment of overtime, and to produce documents.

The obligations of this agent's blanket term bond as expressed on Customs Form 7569 are specific and unequivocal:

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT—

(1) If the above-bounden principal shall pay to the collector of customs of said port(s) promptly on demand such penalties as may be incurred by the vessels, vehicles, or aircraft, together with the sums chargeable under law and regulations for such services as may be performed for said vessels, vehicles, or aircraft by customs officers or employees, *and shall promptly pay any duties, charges, exactions, penalties, or other sums found legally due the United States from any master or other proper officer or owner of said vessels,* vehicles, or aircraft on account of said vessels, vehicles, or aircraft;

.    .    .    .    .    .

Then this obligation shall be void; otherwise to remain in full force and effect. (Emphasis added).

The master or owner of the vessel or its local berth agent secures a permit from the Collector of Customs for certain designated operations or services at the port of entry by filing Customs Form 3171. The blanket bond is specifically referred to and obligated for any liability created as a result of the prescribed operations or services at the port. This form is entitled "Application and Permit to Lade or Unlade Vessels of 5 Net Tons or More and to Allow Unentered Cargo to Remain upon Wharf Beyond 5-Day Period." The regulations provide that:

A master, owner, or agent of a vessel  .  .  .  who desires that arrival may be reported, entry made, and clearance obtained on board the vessel shall file with the district director of customs an application on customs Form 3171 and a bond on customs Form 7567 in such penal sum as the district director of customs deems sufficient but not less than $1,000, or the usual term bond on customs Form 7569.

19 C.F.R. § 4.16(a). The regulations further provide that the Collector of Customs shall not issue a permit unless the merchandise is duly entered and a permit issued or a vessel bond on Customs Form 7567 or 7569 is given. 19 C.F.R. §§ 4.16, 4.30.[3]

3. Section 4.16(b) provides that:
(b) If the application is approved, the collector of customs or such deputy collector of customs as may be designated by him shall receive the report of arrival and the entry of the vessel and grant it clearance on board the vessel.
Section 4.30 provides, in part, that:
§ 4.30 Permits and special licenses for unlading and lading.
(a) Except as prescribed in paragraph (f), (g), or (k) of this section or in § 123.8 of this chapter and except in the case of a vessel exempt from entry or clearance under 19 U.S.C. 288 no passengers, cargo, baggage, or other article shall be unladen from a vessel which arrives directly or indirectly from any port or place outside the customs territory of the United States and no cargo, baggage, or other article shall be laden on a vessel destined to a port or place outside the customs territory of the United

States, if customs supervision of such lading is required, until the collector shall have issued a permit or special license therefor on customs Form 3171.
(b) Application for such a permit or special license shall be made by the master, owner, or agent of the vessel on customs Form 3171, and shall indicate the type of operations desired. An agent of a vessel may limit his application to operations involved in the entry and unlading of the vessel or to operations involved in its lading and clearance.
(c) No unlading or lading requiring customs supervision shall be done at night or on a Sunday or holiday unless the application on customs Form 3171 is supplemented by a request of the master, owner, or agent of the vessel for overtime services of customs officers and the request is approved by the district director of customs. Such approval, together with the permit, shall constitute

## IV.

### THE ANALYSIS

■ With this background the Court turns to the specific issue involved in these lawsuits—the scope of liability of a local berth agent on his blanket bond. A partial resolution of this issue has been previously litigated in the United States Customs Court and decided favorably to the Government. In Caldwell Shipping Co. v. United States, 53 Cust. Ct. 311 (1964) the Customs Court concluded that a local berth agent's blanket bond which is identical to the one at issue in this lawsuit includes the obligation to pay foreign vessel repair duties. The Court's analysis and its conclusion were set forth as follows:

At the time the vessel arrived in Jacksonville, plaintiff acted as agent of the operator of the vessel and covered the vessel under its blanket bond for $10,000. (See Customs Regulations, section 4.14, providing that entry shall be made for equipment or repairs of vessels and that estimated duties shall be deposited, or a bond on customs Form 7567 or 7569 given, before the vessel shall be allowed clearance; and section 25.4(20) providing for "Blanket vessel, vehicle, or aircraft term bond, customs Form 7569, in the amount of $10,000 * * *").

The master of the vessel filed an incomplete repair entry. Plaintiff was unable to get information necessary to complete the entry. However, plaintiff or its principal seems to have given the collector an estimate of the cost of repairs, namely, $2,800, and it is this estimate the collector used in assessing duty. Plaintiff filed a protest and eventually, in order to avoid action on its bond, paid the duty.

The statute provides that where the owner or master willfully and knowingly neglects to make entry and pay duties on repairs made abroad, the vessel shall be seized and forfeited. Plaintiff claims that the vessel should have been seized in the instant case. However, this procedure might not have been proper, since the master did in fact make an entry, although an incomplete one; and the duties were covered, first, by the bond of the agent and, later, by payment of duties by that agent.

---

a special license. The request for overtime services of customs officers, shall be made on customs Form 3171. Such request for overtime services must specify the nature of the services desired and the exact times when they will be needed, unless arrangements are made locally so that the proper customs officer will be seasonably notified during official hours in advance of the rendering of the services as to the nature of the services desired and the exact times they will be needed. Such request shall not be approved unless the required cash deposit or bond on customs Form 7567 or 7569 shall have been received, except that, when a carrier has on file a bond on customs Form 3587, no further bond shall be required solely by reason of the unlading or lading at night or on a Sunday or holiday of merchandise or baggage covered by bonded transportation entries. If a request for overtime services is limited as set forth in paragraph (b) of this section, appropriate words such as "to enter and unlade", or "to lade and clear", shall be used in the request. Separate bonds shall be required if overtime services are requested by different principals.

(d) Except as prescribed in paragraph (f) and (g) of this section, a separate application for a permit or special license shall be filed in the case of each arrival. The permit or special license shall not become effective until the master shall have made preliminary or formal entry or, in the case of vessels not required to enter, the master shall have reported the arrival of the vessel.

.     .     .     .     .

(i) The collector shall not issue a permit to unlade cargo or equipment of vessels arriving directly or indirectly from any port or place outside the customs territory of the United States, except on compliance with one or more of the following conditions:

(1) The merchandise shall have been duly entered and permits issued; or

(2) A vessel bond on customs Form 7567 or 7569 shall have been given; or

(3) The merchandise is to be discharged into the custody of the collector of customs as provided for in section 490(b) Tariff Act of 1930.

53 Cust.Ct. at 313. This conclusion of the Customs Court is in accord with a 1970 decision of the Department of the Treasury wherein it was specifically indicated that an agent's bond posted to cover entry of a vessel was not limited to the transactions identified on Customs Form 3171. The language of such administrative decision is particularly appropriate here:

> Bond posted for vessel's entry includes obligation for duty on foreign vessel repairs.—When a vessel agent posts his Vessel, Vehicle, or Aircraft Bond, to cover entry of a vessel, all conditions of the bond are obligated and obligation is not limited to cover only those transactions identified on Customs Form 3171, Application Permit– Special License Unlading–Lading– Overtime Services, filed by the agent at the time of entry. The condition of the bond to pay any duties found legally due the United States include duty due on foreign vessel repairs under section 257, title 19, United States Code, limited to the face value of the bond.

4 Cust.Bull. 783, T.D. 70–254(2) (1970). In this regard it should be noted that interpretations and opinions of an administrative agency "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); Estate of Charles Henry Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939).

■■ Further, as the Court in *Caldwell Shipping Co.* inferred, the statute, 19 U.S.C. § 257, authorizes an in personam action as opposed to seizure in an in rem action to recover the foreign vessel repair duties. Accordingly, a civil action on a bond which guarantees the payment of vessel repair duties is not precluded by a failure to seize and forfeit the vessel. United States v. Cottman Co., 190 F.2d 805 (4th Cir. 1951), cert. denied, 342 U.S. 903, 72 S.Ct. 292, 96 L.Ed. 676 (1952). As in other actions for the collection of duties on other forms of merchandise, forfeiture is generally considered a penalty for failure to comply with the statutory mandates and not an initial method of collection of the duties. *See* The Patricia, 81 F.2d 814 (9th Cir. 1936).

■ In order to avoid the liability imposed by these authorities the defendants rely basically upon two contentions. First, it is contended that since the regulations, 19 C.F.R. § 4.14(b), provide that "[e]stimated duties shall be deposited or a bond on customs Form 7567 or 7569 given" it follows that the regulations were referring to a bond filed after the duties were estimated. Therefore, it is argued, the blanket bonds, although filed on Customs Form 7569, could not be construed to be within this regulation, since they were filed months prior to the duties being estimated. Conjunctively, it is asserted that the blanket bonds are subject only to the obligations created by Customs Form 3171. Secondly, the defendants contend that to assume that these defendants would undertake cavalierly the obligation of paying foreign repair duties on any vessel for which it was only local agent would be contrary to common business judgment. In this regard, it is asserted that these local berth agents represent many vessels at various ports and that they have no knowledge of or control over the innumerable repairs performed on these vessels.

■ While possessing some initial surface appeal, these contentions are totally without merit. Defendants Collin & Gissel and Thibodeaux were acting as local berth agents, and in that capacity they undertook to post and posted blanket bonds which literally recite and provide for the assumption of all duties or penalties legally due the Government from any master or vessel owner which the agent has undertaken to represent at the port. Such recitations and ensuing obligations of the blanket bonds on Customs Form 7569 can only be viewed as clear and unequivocal. To construe the language of the blanket bonds so as to

include foreign repair duties merely requires the implementation of its plain meaning. The construction which the defendants urge would distort the plain meaning of the liability clause of the bonds and for no apparent reason would leave the Government without a remedy. *See* United States v. St. Paul-Mercury Indemnity Co., 194 F.2d 68 (3d Cir. 1952). The defendants have not contended that the language of the bonds is ambiguous, and such a contention, if urged, would be without merit since the bonds clearly "can be given a certain or definite legal meaning or interpretation". Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977, 980 (1941). Additionally, both Customs Form 3171 and the blanket bond on Customs Form 7569 expressly refer to the entry and clearance of the vessel. *See* 19 C.F.R. § 4.30(b). Therefore, it does not appear unreasonable to conclude that the blanket bonds will cover obligations arising out of the entry and clearance of a vessel such as the SS SEA PIONEER. Similarly, defendants' final contention is unpersuasive. The generally recognized rule is that "courts will not construe a contract to mean that the parties have agreed to act contrary to what common sense and the circumstances obviously demand, unless the contract is explicit and clear in that meaning." Stool v. J. C. Penney Co., 404 F.2d 562, 566 (5th Cir. 1968). Even if the recitations in these contracts, the blanket bonds, were contrary to common business sense, which has certainly not been proven, the subject instruments can only be viewed as explicit and clear.

The factual context in which this dispute arises points up the somewhat informal manner in which the customs agents and shipowners have handled matters relating to duties on foreign repairs performed on documented vessels. What might be initially viewed as the laxity of the customs agents in performing this governmental function can even more readily be seen as a procedural accommodation to the shipowner and the master of the vessel which is in port to discharge and load cargo in most instances on a tightly scheduled itinerary. Under such circumstances defendants as local agents for the SS SEA PIONEER and their sureties on the blanket bonds should not be permitted to extricate themselves from liability by asserting that the bond provisions do not cover such a novel contingency as exists in this case.

Unquestionably, the Secretary of the Treasury could require that a special entry bond be posted by the shipowner or its representative upon arrival in port unless a blanket bond was on file in order to protect the collection of the revenue and to assure compliance with the statute. *See* 19 U.S.C. §§ 66, 1623, 1624. Yet, there was no obligation, statutory or otherwise, requiring these defendants as vessel agents to assume the statutory obligation of the vessel owner or master by paying the repair duties or posting such bonds, just as there was no obligation of these defendants to act as local berth agents and file Customs Form 3171. It was only their agency relationship with the vessel owner that created the obligation to post a bond. It does not appear to be unusual for an agent of an owner or consignee of merchandise in other situations to make an entry and pay or post a bond for the duties due. *See* 19 U.S.C. §§ 1484, 1485, 1505. The defendants, acting as agents, chose to act for their principal, the vessel owner, and were so viewed by the third party and obligee, the United States of America.

When it ultimately developed that the vessel owner was bankrupt and could not respond in the usual way to pay the liquidated duties for foreign ship repairs, the Government looked to alternative sources. Since the foreign repair duties, as in the case of other duties which the vessel owner and master were liable for, were encompassed within the broad language of these blanket bonds, the United States could reasonably rely on the vessel owner and, alternatively, on such bonds when releasing the vessel in accord with the dictates of the applicable statute and Treasury Regulations. This construction of the scope of the lia-

bility of the blanket bonds is viewed as being entirely consistent with the purpose of the tariff statute. *See* Caldwell Shipping Co. v. United States, 53 Cust. Ct. 311 (1964).[4] The fact that this precise situation involving a bankrupt vessel owner had not arisen previously according to the record in this case does not alter this Court's conclusion as to the applicable law when the situation does arise.

The Court can only conclude that this obligation, unusual though it may be, was within the authority of these agents and within the agency agreement with their principal, the owner of the SS. SEA PIONEER, since no evidence to the contrary has been presented for this Court's consideration. The scope of an agency relationship is determined by the agreement between the parties and the particular circumstances under consideration. 2 S. Williston, A Treatise on the Law of Contracts § 274 (3d Ed. 1959). Within the scope of this relationship the acts of the agent are those of the principal. This would include protests by an agent against an assessment for foreign repair duties. Yel Chong Lung & Co. v. United States, 11 Ct.Cust.App. 382 (1922). Clearly, the mere fact that an agency relationship exists does not preclude the imposition of personal liability on an express contract with a third party, even though the contract is primarily for the benefit of the principal. Dietrich v. United States Shipping Bd. Emergency Fleet Corp., 9 F.2d 733 (2d Cir. 1925);

Restatement (Second) of Agency § 335 (1958).

Further, the defendants Collin & Gissel and Thibodeaux cannot assert that this risk was outside of their realm of knowledge and incapable of being reasonably ascertained. In view of the all inclusive language of their blanket bonds, the explicit language of the Treasury Regulations and the *Caldwell* decision, this potential liability could have been readily determined if the defendants had made inquiry. Similarly, the defendant surety companies as specialized business corporations are compensated to assume reasonable and ascertainable risks which are created by obligations that they insure in the normal course of their business. *See* 10 S. Williston, A Treatise on the Law of Contracts § 1213 (3d Ed. 1967).

There is no evidence in the record which reflects that the attempts by the Government to liquidate and collect the tariff duties were not carried out with reasonable expediency. The delay appears to have been primarily attributable to the laxity of the vessel owner in complying with the Government's requests to liquidate the duties which were due. Defendants Gissel and Thibodeaux were not unaware of this situation. Eventually, the shipowner for unspecified reasons went bankrupt. Under the broad provisions of the blanket bonds, the local berth agents then became unconditionally liable for these duties. The sureties would not be discharged because of the inaction of a

4. In the *Caldwell Shipping Co.* decision the Court indicated that:

The statute does not require an agent to pay the duties on repairs; but if the owner or master employs an agent, and the agent does pay the duties, his action, like other actions of an agent, is the action of the principal if it is within the scope of the agent's authority. Yee Chong Lung & Co. et al. v. United States, 11 Ct.Cust.Appls. 382, T.D. 39191; Bemis Bro. Bag Co. v. United States, 59 Treas.Dec. 169, T.D. 44558.

Although the authority of the agent here has not been delineated precisely, and we lack proofs, to represent a ship's operator at the port of entry often involves the expenditure of money;

therefore, a request on the part of the principal to incur expenditure may be inferred, together with an implied promise to repay. 3 Corpus Juris Secundum, Agency, section 197.

Under the circumstances, the Government would have a right to rely on plaintiff's implied or apparent authority to pay the duty assessed and which plaintiff did, in fact, pay. Plaintiff's grievance is against its principal, and it may not claim relief from a third party (the Government) because of the principal's failure to furnish information or to reimburse plaintiff for the amounts expended for the principal.
53 Cust.Ct. at 313–14.

creditor to enforce the claim against the principal. *See* Restatement of Security § 130 (1941).

Accordingly, it is the decision of this Court that the Government is entitled to recover from defendants Collin & Gissel and C. J. Thibodeaux & Company, as principals on the bonds, and defendants Globe Indemnity Co. and Travelers Indemnity Co., as sureties on the bonds, the total amount of the two $10,000 bonds in issue. The various stipulations of facts of the parties as supplemented herein from the submitted record, are adopted as the Court's Findings of Fact and the foregoing constitute the Court's Conclusions of Law.[5] Counsel will prepare and submit an appropriate judgment within twenty (20) days incorporating by reference such Findings of Fact and Conclusions of Law and properly assessing interest and costs. The clerk will notify counsel.

---

5. Concurrent with submission defendants, C. J. Thibodeaux and Company, Globe Indemnity Company and The Travelers Indemnity Company, have filed a motion to strike certain deposition testimony and exhibits apparently offered by the Government as background information for the benefit of the Court. Inasmuch as the decision in this case does not rest on a consideration of the opinions expressed in such depositions, the motion is granted as to them; however, in view of certain of the stipulations of facts, the motion is denied as to the Government exhibits which have been considered and given such weight by the Court as they are entitled to receive in arriving at a decision in this case.